# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

APX OPERATING COMPANY, LLC,   )
                                         )
            Plaintiff,          )
                                         )
           v.                ) C.A. No. N21C-03-058 AML CCLD
                                         )
HDI GLOBAL INSURANCE COMPANY, )
                                         )
           Defendant.      )

Submitted: September 22, 2021
Decided: November 18, 2021

## MEMORANDUM OPINION AND ORDER

## Upon Defendant's Motion to Dismiss: GRANTED

Brian M. Rostocki, Esquire, Benjamin P. Chapple, Esquire, Justin Forcier, Esquire, John Ellison, Esquire, Miranda Jannuzzi, Esquire, of REED SMITH LLP, Wilmington, Delaware, *Attorneys for Plaintiff APX Operating Company, LLC*

John D. Balaguer, Esquire, of WHITE AND WILLIAMS LLP, Wilmington, Delaware, and Kristin C. Cummins, Esquire, of ZELLE LLP, Dallas, Texas, and Kristin A. Heres, Equire, of ZELLE LLP, Framingham, MA, *Attorneys for Defendant HDI Global Insurance Company, LLC*

**LeGrow, J.**

The plaintiff, a Delaware LLC that owns and operates eight businesses through various subsidiaries, seeks insurance coverage for economic losses resulting from the COVID-19 pandemic and associated government closure mandates. The policy at issue insured the plaintiff's real property against "direct physical loss or direct physical harm," and against the losses that accrue when such loss or harm requires business operations at the property to be suspended. The insurer argues the plaintiff's coverage claim must be dismissed because the plaintiff has not identified "direct physical loss or direct physical damage" sufficient to establish coverage. Alternatively, the insurer argues several policy exclusions preclude coverage.

The pending motion raises two questions. First, has the plaintiff established that its claim falls within the coverage granted by the policy? Second, has the insurer established that the policy specifically excludes the plaintiff's claim? The first question need not be answered because the claim would be excluded even if the plaintiff could establish coverage in the first instance. Accordingly, the insurer's motion to dismiss is granted. Although the Court recognizes and sympathizes with the significant toll COVID-19 wrought on businesses and their employees through the country, the Court is bound to give effect to the clear and unambiguous terms of the plaintiff's insurance policy.

## BACKGROUND

Unless otherwise noted, the following facts are drawn from the Complaint and the documents it incorporates by reference, drawing all reasonable inferences in the plaintiff's favor.

### A. The Parties

Plaintiff APX Operating Co., LLC ("APX") is a Delaware limited liability company.[1]  It is the sole owner of eight subsidiaries, all of which are Delaware limited liability companies.[2]  Through its subsidiaries, APX operates six family entertainment centers and two water parks in California, Florida, and New Jersey.[3] These eight properties constitute the "Insured Properties" at issue in this case.[4]

Defendant HDI Global Insurance Co. ("HDI") is an Illinois corporation with its principal place of business in Illinois.[5]  It is licensed to do business in Delaware, where it sells property insurance covering companies' commercial risks.[6]

### B. The Policy

HDI sold Commercial Lines Policy number CPD5484800[7] to Apex Parks Group, LLC, which was extended by endorsement to include the period from May

---

[1] Complaint at ¶ 9 (D.I. 1).
[2] *Id.* at ¶¶ 10, 12.
[3] *Id.* at ¶¶ 11–15, 21, 23.
[4] *Id.* at ¶ 22.
[5] *Id.* at ¶ 16.
[6] *Id.* at ¶ 17.
[7] The Policy is attached to the Complaint as Exhibit A and is cited hereinafter as "Policy."

8, 2019 to May 8, 2020 (the "Policy").[8] Apex Parks is the Named Insured under the Policy.[9] APX acquired Apex Parks' rights to payment under the Policy for the claim at issue in this case.[10]

The Policy's Insuring Clause states it "insures against risks of direct physical loss or direct physical damage, except as excluded, to Insured covered property while on described premises."[11] The Policy also insures "TIME ELEMENT LOSS" as follows:

> A. This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from direct physical loss or damage of the type insured by this Policy:
> 1) to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;
> 2) used by the Insured, or for which the Insured has contracted use;
> 3) located at an Insured Location; and
> 4) during the Periods of Liability described in this section.[12]

The Policy's "TIME ELEMENT" coverage includes "GROSS EARNINGS" and "EXTRA EXPENSE."[13] These coverages apply to lost earnings and extra costs incurred to "temporarily continue as nearly normal as practicable" the business.[14]

---

[8] *Id.* at ¶ 31.
[9] *Id.* at ¶ 32.
[10] *Id.* at ¶ 33; *see also id.* at ¶¶ 28–30.
[11] *Id.* at ¶ 33; *see also* Policy at 2.
[12] Complaint at ¶ 38; *see also* Policy at 29.
[13] Complaint at ¶ 40; *see also* Policy at 29–30, 32–33.
[14] Complaint at ¶ 40; *see also* Policy at 32.

Under both sections, the recoverable loss is measured during the "PERIOD OF LIABILITY," which the Policy defines as follows:

> A. The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown, or if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS, is as follows:
>    1) For building and equipment, the period:
>       a) starting from the time of direct physical loss or damage of the type insured against; and
>       b) ending when with due diligence and dispatch the building and equipment could be:
>          (i) repaired or replaced; and
>          (ii) made ready for operations,
>          under the same or equivalent physical and operating conditions that existed prior to the damage.
>       c) not to be limited by the expiration of this Policy.

\*     \*     \*

>    8) If an order of CIVIL or MILITARY AUTHORITY specifically prohibits access to the Insured Location and provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1 mile of it, the period of time:
>       a) starting at the time of such direct physical damage; but
>       b) not to exceed the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

The Policy contains several exclusions, two of which are relevant here. First, the Policy excludes "contamination including but not limited to the presence of

4

pollution or hazardous material" (the "Pollution and Contamination Exclusion").[15]

The Policy defines these terms in a separate section as follows:

> **Pollutant(s) and/or Contaminant(s) and/or Hazardous Material(s)**
> The term pollutant(s), contaminant(s), hazardous material(s) shall mean any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, bacteria, virus, vaccines and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

> **Pollution and/or Contamination**
> The terms pollution and/or contamination shall mean the presence of any material which after its release or discharge can cause or threaten damage to human health and/or human welfare, or causes or threatens damage, deterioration, loss of value, marketability and/or loss of use to insured property, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and/or Toxic Substances Control Act, or as designated by the US Environmental Protection Agency or, local equivalent environmental agency.[16]

Second, the Policy excludes coverage for "loss of market or loss of use" (the "Loss of Use Exclusion") as follows:

> **EXCLUSIONS**
> The following exclusions apply unless specifically stated elsewhere in this Policy:
> A.    This Policy excludes:
>     1)    indirect or remote loss or damage.
>     2)    delay, interruption of business, except to the extent provided by this policy.
>     3)    loss of market or loss of use.[17]

---

[15] Policy at 27.
[16] *Id.* at 14.
[17] *Id.* at 25.

5

## C. The COVID-19 Pandemic

In December 2019, an outbreak of the illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 first was identified.[18]  A pandemic arose in the following months.[19]  SARS-CoV-2 is highly transmissible, even by asymptomatic individuals.[20]  An individual can become infected through exposure to respiratory droplets of an infected person, as well as by touching surfaces or objects that have SARS-CoV-2 on them and then touching his or her mouth, eyes, or nose.[21]  Infected persons shed infectious SARS-CoV-2 virions in high quantities.[22]  Although these virions are microscopic, they physically exist in the air and attach to surfaces.[23]  SARS-CoV-2 virions may remain viable on surfaces for hours or days, depending on the material.[24]

Beginning in March 2020, state and local governments in the United States issued orders suspending or severely curtailing the operations of non-essential businesses.[25]  These orders "resulted from the need to address the spread of SARS-CoV-2 and the transmission of COVID-19" in the areas affected by the orders.[26]

---

[18] Complaint at ¶ 60.
[19] *Id.*
[20] *Id.* at ¶¶ 63–68.
[21] *Id.* at ¶ 65 (citing CTR. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/faq.html).
[22] *Id.* at ¶¶ 66, 68.
[23] *Id.* at ¶ 69.
[24] *Id.* at ¶ 70.
[25] *Id.* at ¶¶ 72–73.
[26] *Id.* at ¶ 74.

Such orders required operations to be suspended at APX's subsidiaries in California, Florida, and New Jersey.[27] Most of the businesses were allowed to re-open starting in late June and early July after the closure mandates began to lift.[28] Social distancing procedures and other limitations on operations have continued to affect APX's businesses, however, and none have returned to pre-interruption earning levels.[29]

Because of the infectious nature of SARS-CoV-2, APX alleges:

it is a statistical certainty that SARS-CoV-2 virions were physically present in the air, within infected persons, and on surfaces located at most, if not all, of the Insured Properties prior to the issuance of the aforementioned civil authority orders, and that infected individuals would have been present at all of the Insured Properties and surrounding properties on an ever-increasing number in the absence of the issuance of those orders.[30]

The alleged release of COVID-19 virions into the air and onto the surfaces within the Insured Properties made the properties "dangerous" and the air "potentially lethal to breathe."[31]

**D. Coverage Dispute & Litigation**

In its Complaint, APX identifies several losses it contends fall within the Policy's coverage. First, APX identifies "[t]he statistically-certain presence of

---

[27] *Id.* at ¶¶ 75–102.
[28] *Id.* at ¶¶ 84, 86, 93, 100.
[29] *Id.* at ¶¶ 85, 87–88, 93–94, 101–02.
[30] *Id.* at ¶ 110.
[31] *Id.* at ¶ 112.

SARS-CoV-2 virions at or near the Insured Properties, and/or the ubiquitous and inevitable presence of SARS- CoV-2 virions throughout the locales and states where the Insured Properties are located."[32] APX alleges this "is a risk of direct physical loss or direct physical damage, and not otherwise excluded" under the Policy.[33]

Second, APX identifies the "issuance of the above-referenced civil authority orders" as a covered loss because "it is a risk of direct physical loss or direct physical damage, and not otherwise excluded" under the Policy.[34] Third, APX identifies the "issuance of the above-referenced civil authority orders" as a covered loss "because the Gross Earnings loss and Extra Expense loss coverages include Civil or Military Authority coverage, the orders resulted from 'physical damage' (*i.e.*, the statistically-certain presence and/or ubiquitous and inevitable presence of SARS-CoV-2 virions) at or within five miles of the Insured Properties, and the civil authority orders are not otherwise excluded" under the Policy.[35]

APX submitted to HDI a coverage claim for losses related to the COVID-19 pandemic.[36] On November 10, 2020, HDI sent a letter to APX denying coverage.[37] HDI explained there was no "covered 'direct physical loss or direct physical damage' as required under the Policy's Insuring Clause" and "there is no coverage

---

[32] *Id.* at ¶ 115.
[33] *Id.*
[34] *Id.* at ¶ 116.
[35] *Id.* at ¶ 117.
[36] *Id.* at ¶ 126.
[37] *Id.* at ¶ 127.

for any claimed time element loss" as "direct physical loss or damage of the type insured under the Policy" had not been identified.[38]  Additionally, HDI stated that various policy exclusions precluded coverage.[39]

APX filed its Complaint on March 5, 2021.  Count I requests a declaration "of [APX's] rights and of the obligations of HDI under the All Risk Policy."[40]  Count II alleges "HDI breached and continues to breach its contractual obligations under the All Risk Policy by failing and/or refusing to pay the aforementioned covered Gross Earnings and Extra Expense losses."[41]

HDI moved to dismiss the Complaint under Rule 12(b)(6).[42]  The Court heard argument on September 22, 2021 and took the motion under advisement.[43]

## PARTIES' CONTENTIONS

HDI advances two arguments in favor of dismissal.  First, HDI argues APX cannot establish that it suffered "direct physical loss or direct physical damage" to covered property.[44]  For the first part of this argument, HDI focuses on Delaware's pleading standards, contending that the "unconfirmed presence" of the virus at APX's locations is insufficient to establish coverage.[45]  HDI next contends the virus

---

[38] *Id.*
[39] *Id.* at ¶ 129.
[40] *Id.* at ¶ 139–45; *see also id.* at Prayer for Relief (listing the declarations that APX seeks).
[41] *Id.* at ¶ 146–51.
[42] HDI's Mot. to Dismiss (D.I. 12).
[43] D.I. 25.
[44] HDI's Opening Br. in Supp. of Mot. to Dismiss at 14–28 (D.I. 12).
[45] *Id.* at 15–16.

would not trigger coverage even if it were present because the virus causes no "physical change to the property it touches."[46]  Additionally, HDI cites *Sullivan v. Standard Fire Insurance Co.* as prohibiting APX from establishing "direct physical loss or direct physical damage" through "loss of use."[47]  Finally, HDI reasons that APX cannot establish coverage through the Policy's Time Element Coverage because that section "incorporate[s] the threshold coverage requirements articulated in the Insuring Agreement."[48]

As to this portion of HDI's motion, APX resists the contention that it has not adequately pleaded direct physical loss or direct physical harm to the Insured Properties.  APX acknowledges it has not proven the virus was present.  APX contends, however, that specific factual allegations regarding the "statistically-certain presence" of the virus are sufficient to satisfy Delaware's minimal pleading standard.[49]  Additionally, APX disputes HDI's argument that physical loss or damage requires a physical change to the property, arguing HDI's interpretation contradicts both the Policy's terms and Delaware law.[50]  As a matter of contract interpretation, APX maintains that the phrase "physical loss or damage" reasonably can be construed as including a physical condition or event that renders property

---

[46] *Id.* at 16–19.
[47] *Id.* at 19–20 (citing *Sullivan v. Standard Fire Ins. Co.*, 2008 WL 361141 (Del. 2008)).
[48] *Id.* at 21–28.
[49] APX's Answering Br. in Opp. to Mot. to Dismiss at 5–7 (D.I. 20).
[50] *Id.* at 7–9.

unsafe or unfit for its intended use.[51]  Furthermore, APX contends it adequately has

alleged a claim for Civil or Military Authority coverage.[52]

HDI alternatively argues that several policy exclusions would preclude

coverage even if APX could establish coverage in the first instance.  HDI first points

to the Pollution and Contamination Exclusion, which HDI interprets as excluding

coverage for loss or damage resulting from viruses.[53]  Next, HDI argues the Loss of

Use Exclusion bars coverage because the "Complaint is replete with claims that its

losses derive from loss of use of [the] properties."[54]

APX responds that dismissal is unwarranted because HDI has not met its

burden of showing that any coverage exclusions apply.  APX contends the language

describing the Pollution and Contamination Exclusion "make[s] clear the exclusion

is limited to traditional environmental pollution or contamination."[55]  Additionally,

APX interprets the exclusion as applying only to "contamination" but not to "loss"

resulting from contamination.[56]  Finally, APX argues that "applying the loss of use

---

[51] *Id.* at 9–29.

[52] *Id.* at 29–33. The parties both view the reference to a "Civil or Military Authority" order prohibiting access to the insured location as a distinct coverage grant under the policy.  The provision, however, appears in the "Period of Liability" section, and appears only to define the period of liability applicable to coverage arising as a result of such an order. *See* Policy at 38–40. The Court remains unconvinced that separate "Civil or Military Authority" coverage exists under this policy, but the issue is academic in light of the Court's conclusions regarding the Pollution and Contamination Exclusion.

[53] HDI's Opening Br. in Supp. of Mot. to Dismiss at 29–32.

[54] *Id.* at 32–33.

[55] APX's Answering Br. in Opp. to Mot. to Dismiss at 33–35.

[56] *Id.* at 36–37.

exclusion as HDI seeks would impermissibly vitiate coverage" and that APX is not seeking coverage for "pure" loss of use in any event.[57]  Instead, APX maintains it seeks coverage for losses caused by direct physical loss or damage.[58]

Finally, HDI argues APX's declaratory judgment claim also must be dismissed because there is no coverage under the Policy.[59]  APX opposes dismissal, contending it adequately has stated a claim for coverage.[60]

## ANALYSIS

### A. Standard of Review and Rules of Contract Interpretation

A claim must be dismissed under Superior Court Civil Rule 12(b)(6) if the complaint fails "to state a claim upon which relief can be granted."[61]  Under this standard, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[62]  The Court, however, must "ignore conclusory allegations that lack specific supporting factual allegations."[63]

---

[57] *Id.* at 38–39.
[58] *Id.*
[59] HDI's Opening Br. in Supp. of Mot. to Dismiss at 33–34.
[60] APX's Answering Br. in Opp. to Mot. to Dismiss at 39.
[61] Del. Super. Ct. Civ. R. 12(b)(6).
[62] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011); *Doe v. Cedar Academy*, 2010 WL 5825343, at *3 (Del. Super. Ct. Oct. 27, 2010).
[63] *Rammuno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998).

12

Interpreting an unambiguous contract, including an insurance policy, is a question of law that appropriately may be resolved on the pleadings.[64] When a contract only is susceptible of one interpretation, and that interpretation effectively negates the claim as a matter of law, a motion to dismiss should be granted.[65]

The Delaware Supreme Court recently reaffirmed the settled principles of Delaware law governing interpretation of insurance contracts:

> Insurance contracts, like all contracts, 'are construed as a whole, to give effect to the intentions of the parties.' Proper interpretation of an insurance contract will not render any provision 'illusory or meaningless.' If the contract language is 'clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning.' Where the language is ambiguous, the contract is to 'be construed most strongly against the insurance company that drafted it.' A contract is not ambiguous simply because the parties do not agree on the proper construction. 'Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'[66]

The Delaware Supreme Court also summarized an insured's burden of proof in establishing the existence of coverage and an insurer's burden of proving the applicability of one or more coverage exclusions:

> Insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations. 'Generally, an insured's burden is to establish that a claim falls

---

[64] *RSUI Indemnity Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021); *Vinton v. Grayson*, 189 A.3d 695, 699–700 (Del. Super. Ct. 2018).

[65] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 614–15 (Del. 2003).

[66] *Murdock*, 248 A.3d at 905–06 (internal citations omitted).

13

within the basic scope of coverage, while an insurer's burden is to establish that a claim is specifically excluded.' Courts will interpret exclusionary clauses with 'a strict and narrow construction . . . [and] give effect to such exclusionary language [only] where it is found to be 'specific,' 'clear,' 'plain,' 'conspicuous,' and 'not contrary to public policy.'[67]

## B. The Pollution and Contamination Exclusion bars APX's claim

HDI argues the Policy's Pollution and Contamination Exclusion bars APX's coverage claim even if APX can establish coverage in the first instance. The Court agrees. The language of the Pollution and Contamination Exclusion is "specific, clear, plain, conspicuous, and not contrary to public policy" even under the "strict and narrow construction" the Court must give policy exclusions.[68] HDI has met its burden of establishing that APX's claim falls within the exclusion. Accordingly, even if APX adequately has pleaded that the COVID-19 pandemic caused direct physical loss or direct physical damage at the Insured Properties, coverage would be excluded. The Court therefore declines to separately address the as-yet unanswered question of whether the presence of the SARS-CoV-2 virions at a property amounts to direct physical loss or direct physical damage under Delaware law.[69]

---

[67] *Id.* at 906 (internal citations omitted).

[68] *Id.* at 905 (internal quotations and citations omitted).

[69] Courts across the country are beginning to confront this coverage question and have come down on both sides of the issue. *See, e.g., Tria WS LLC v. Am. Auto. Ins. Co.*, 2021 WL 1193370, at *4– 5 (E.D. Pa. Mar. 30, 2021) (granting insurer's motion to dismiss because insured failed to allege a "direct physical loss" of the insured property and collecting opinions that have held similarly); *Scott Craven DDS PC v. Cameron Mut. Ins. Co.*, 2021 WL 1115247, at *1–3 (Mo. Cir. Mar. 9, 2021) (denying insurer's motion to dismiss because "Plaintiffs sufficiently allege both physical loss and physical damage"); *In re Soc'y Ins. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F.

The Policy excludes "contamination including but not limited to the presence of pollution or hazardous material,"[70] with "pollution and/or contamination" defined as:

> [T]he presence of any material which after its release or discharge can cause or threaten damage to human health and/or human welfare, or causes or threatens damage, deterioration, loss of value, marketability and/or loss of use to insured property, including, but not limited to, bacteria, **virus**, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and/or Toxic Substances Control Act, or as designated by the US Environmental Protection Agency or, local equivalent environmental agency.[71]

The Policy's express language unambiguously excludes coverage for viruses that cause or threaten damage to human health. The Complaint alleges APX's losses resulted "from the statistically-certain presence of SARS-CoV-2 virions at or near the Insured Properties, and/or the ubiquitous and inevitable presence of SARS-Cov-2 virions throughout the locales and states where the Insured Properties are located, and/or the above-referenced civil authority orders affecting the Insured Properties." Consequently, the plain language of the Policy excludes APX's coverage claim.

---

Supp. 3d 729, 742 (N.D. Ill. Feb. 22, 2021) (denying insurer's motion for summary judgment because a reasonable jury could find the insured suffered a "direct physical loss" due to "pandemic-caused shutdown orders"); *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London Known as Syndicate PEM 4000*, 489 F. Supp. 3d 1303, 1307–08 (M.D. Fla. Sept. 28, 2020) (collecting cases in which courts refused to recognize the pandemic as causing direct physical loss or damage to property).

[70] Policy at 27.

[71] *Id.* at 14 (emphasis added).

APX's counterarguments are unavailing. First, APX contends the Pollution and Contamination Exclusion is limited to "traditional environmental pollution or contamination."[72] No such limitation appears in the Policy. APX is correct that the Policy refers to substances listed in various environmental statutes and regulations. But the Policy expressly states that "pollution and/or contamination . . . include[s], but **[is] not limited to**" those substances.[73] Nor does the Policy's use of the words "release" or "discharge" imply the limitation APX envisions. The plain meaning of both words encompasses the spread or emission of a substance in a general sense, not specifically an environmental one.[74] Indeed, APX's own Complaint alleges that individuals infected with COVID-19 "release" contagious virions.[75] Finally, the Policy contains no language suggesting, as APX argues, that "virus" should be interpreted as referring merely to a "form[] of medical waste, which may also cause environmental pollution or contamination if not properly disposed."[76] In short, no reasonable interpretation of the Pollution and Contamination Exclusion would

---

[72] APX's Answering Br. in Opp. to Mot. to Dismiss at 33–35.

[73] *See* Policy at 14 (emphasis added).

[74] The Policy does not define either word, which requires the Court to consult dictionaries. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."). Merriam-Webster's definition of "release" includes "the act or instance of liberating or freeing (as from restraint)" and "the state of being freed." *Release*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/release (last accessed Oct. 12, 2021). Similarly, its definition of "discharge" includes "a firing off," "a flowing or issuing out," and "something that is emitted." *Discharge*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/discharge (last accessed Oct. 12, 2021).

[75] Complaint at ¶ 112.

[76] APX's Answering Br. in Opp. to Mot. to Dismiss at 35.

permit the conclusion that COVID-19 is not a "virus," and the Court cannot contort the Policy's plain terms to avoid the exclusion's application.[77]

Second, APX argues HDI has not proven that the Pollution and Contamination Exclusion bars APX's claim for "lost income" because the exclusion "applies only to 'contamination including but not limited to the presence of pollution or hazardous material.'"[78] APX makes the mistake of reading the exclusion "in isolation," rather than reading "all of the pertinent provisions of the policy as a whole."[79] The Policy expressly states that "**pollution and/or contamination** . . . **mean[s] the presence of any material which after its release or discharge** can cause or threaten damage to human health and/or human welfare, or **causes or threatens** damage, deterioration, **loss of value, marketability and/or loss of use to insured property**."[80] In other words, the definition of "pollution and/or contamination" expressly includes the economic loss stemming from the presence of the substance, which logically would include lost income. Moreover, the Policy expressly excludes "indirect or remote

---

[77] *See Ascent Hosp. Mgmt. Co., LLC v. Emps. Ins. Co. of Wausau*, 2021 WL 1791490, at *5 (N.D. Ala. May 5, 2021) ("[A]ny definition of "virus" that somehow carves out COVID-19 is not a permissible meaning. This court does not accept [plaintiff's] invitation to engage in the type of mental gymnastics that would permit a finding that the COVID-19 coronavirus is not a virus within the meaning of the Contaminant Exclusion."); *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, 2021 WL 769660, at *6 (D. Nev. Feb. 26, 2021) ("[Plaintiff] cannot reasonably claim that SARS-CoV-2 is not a virus [under a policy's pollutants-or-contaminants exclusion].").

[78] APX's Answering Br. in Opp. to Mot. to Dismiss at 36 (quoting Policy at 27).

[79] *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("We have stated that a court's interpretation of an insurance contract must rely on a reading of all of the pertinent provisions of the policy as a whole, and not on any single passage in isolation.").

[80] Policy at 14.

17

loss or damage,"[81] which likewise would include lost income. And, the Policy provides coverage only for "loss or damage of the type insured by this Policy."[82] Because loss or damage resulting from viral contamination is not insured by the Policy, the exclusion necessarily eliminates all coverage, including lost income.

Third, APX argues the Pollution and Contamination Exclusion cannot "possibly apply to the portion of APX's claim alleging the government orders caused APX's [business interruption] losses."[83] The Court disagrees. As APX itself alleged, the government orders "resulted from the need to address the spread of SARS-CoV-2 and transmission of COVID-19, including because of the known presence or statistically-certain presence of SARS-CoV-2 virions throughout the locales affected by the orders."[84] In other words, APX concedes that the presence of SARS-CoV-2 caused the government shutdown orders. And the Pollution and Contamination Exclusion expressly includes viruses that "cause[] . . . loss of use to insured property."[85] Therefore, the exclusion necessary bars losses stemming from the government closure orders. Courts in other jurisdictions uniformly have rejected

---

[81] *Id.* at 25.
[82] *Id.* at 29.
[83] APX's Answering Br. in Opp. to Mot. to Dismiss at 37.
[84] Complaint at ¶ 74.
[85] Policy at 14.

18

the argument that APX makes here, which attempts to separate the government closure orders from the virus that motivated them.[86]

Fourth, APX argues the cases on which HDI relies are non-binding and distinguishable.[87] Those cases aside, however, interpreting an unambiguous contract is a question of law that appropriately may be resolved on the pleadings. The movant is not required to produce binding case law when the only reasonably interpretation of a contract effectively negates the claim as a matter of law. That is the case here. The Pollution and Contamination Exclusion is unambiguous, and HDI has met its burden of showing that APX's claim falls within it.

## CONCLUSION

For the foregoing reasons, HDI's Motion to Dismiss APX's Complaint is **GRANTED**. Because APX could not amend its Complaint in a manner that would avoid the Pollution and Contamination Exclusion, APX's Complaint is dismissed with prejudice.

**IT IS SO ORDERED**.

---

[86] *See, e.g., J.G. Optical, Inc. v. Travelers Companies, Inc.*, 2021 WL 4260843, at *5–6 (D.N.J. Sept. 20, 2021); *Stanford Dental, PLLC v. Hanover Ins. Grp., Inc.*, 518 F. Supp. 3d 989, 996–98 (E.D. Mich. 2021); *AFM Mattress Co., LLC v. Motorists Com. Mut. Ins. Co.*, 503 F. Supp. 3d 602, 607 (N.D. Ill. Nov. 25, 2020); *Mark's Engine Co. No. 28 Rest., LLC v. Travelers Indem. Co. of Connecticut*, 492 F. Supp. 3d 1051, 1057 (C.D. Cal. 2020); *Diesel Barbershop, LLC v. State Farm Lloyds*, 479 F. Supp. 3d 353, at *361 (W.D. Tex. Aug. 13, 2020).
[87] APX's Answering Br. in Opp. to Mot. to Dismiss at 37.